## BULLOCK v. FIDELITY & CASUALTY CO. OF NEW YORK et al.

### No. 5790.

Court of Appeal of Louisiana.
Second Circuit.

Dec. 9, 1938.

Rehearing Denied Feb. 6, 1939.

Writ of Certiorari and Review Denied
March 6, 1939.

Blanchard, Goldstein, Walker & O'Quin and Coleman & Morgan, all of Shreveport, for appellants.

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff sustained serious physical injuries when sideswiped by an automobile on the concrete Market street viaduct in the city of Shreveport, Louisiana, at about the hour of 7:30 P. M., January 27, 1935, and sues to recover resultant damages. He alleges that Charles G. Wilbur was operating the car that injured him. Wilbur and his insurer, the Fidelity & Casualty Company of New York, are joined as defendants.

Said viaduct extends northerly and southerly and is south of and near the downtown business district of the city of Shreveport. It uniformly carries heavy vehicular traffic and is well lighted at night. Its over-all length is 2570 feet, including earth supported approaches, each in excess of 300 feet long. The balance of its length, over 1900 feet, is suspended several feet above the ground. The passageway between the balustrades measures 42 feet, including a walk 6 feet wide along its east side, dedicated to pedestrians, while the remaining 36 feet is used by vehicles.

The floor of the suspended section of the viaduct the night of the accident was sheathed with a thin ice coating, and to this condition may largely be attributed the accidents thereon with their tragic results, the facts of which we shall hereinafter relate. Sleet was falling; the atmosphere was heavy; and a fog overhung the roadway.

The first accident involved the four-door Chevrolet coach of Mr. W. E. Redding and a Begbie florist truck. The Redding car was traveling south. It was occupied by Mr. Redding, his daughter and Victor Simmons, Jr., residents of Shreveport. When near the center of the viaduct, latitudinally, they observed the Begbie truck approaching them from the south at a rapid speed, zigzagging. It slid into their car violently. The left side of the truck struck the front end of the car. The operator of the truck and another negro therein were hurled violently therefrom to the roadway, one of whom died almost instantly. The Redding car was knocked westerly and stopped at a slight angle to the west balustrade, its right rear fender being only two or three feet therefrom. It pointed southeasterly. The truck rebounded and traveled a short distance northerly and stopped nearly parallel to the sidewalk, a few feet therefrom, facing north. One of the negroes landed near to the rear of the Redding car and the other one fell nearer the side of the truck. The seat cushion of the truck fell out at the point of impact. It was a few feet south of the truck and easterly from the car. It was possible for automobiles carefully operated to pass between these vehicles and not run over the negroes. The first to do so going northerly was R. D. Poindexter. The first two passing through en route south were the plaintiff and Sergeant Richard McDowell, then attached to Barksdale Field. The record does not definitely disclose the order of sequence of these cars in negotiating this passage. Immediately before or after Poindexter drove by the scene, Mr. R. J. Bowman approached it from the south. He observed over 200 feet away that an accident had occurred and governed his movements accordingly. He parked his car immediately at the rear of the Begbie truck, alighted, and walked across to the Redding car. Its occupants, somewhat jolted and excited, had gotten out and were standing on its west side. Miss Redding was hysterical. She was screaming and sobbing and begging to be carried home. Bowman and Redding immediately removed the negroes to the west side of the roadway to prevent them being run over. Miss Redding, with young Simmons' assistance, re-entered the car and occupied the rear seat. He was in the act of entering when the second accident, wherein plaintiff was injured, occurred. About the time Bowman parked his car, plaintiff passed the scene. He parked near the west balustrade about 50 or 75 feet south of the Redding car. He got out and proceeded back to the Redding car. He observed Mr. Bowman (whom he did not then know) standing near its rear left fender talking to Miss Redding. He offered to take her home. Bowman was facing westerly. Plaintiff drew very close to him and faced northerly. At this juncture of events, Mr. Red-

ding was somewhere about his own car trying to find his hat which was knocked from his head in the first collision. The scene was as we here try to portray, when plaintiff observed 200 feet or more distant a car coming from the north at a rapid rate of speed. Knowing that ice covered the roadway and the great danger involved in operating cars rapidly thereon, plaintiff became excited and quickly called Bowman's attention to the situation, and at the same time pushed him toward the rear of the car and to a place of safety. The oncoming car was seen to be zigzagging. Plaintiff tried to jump upon the running board of the Redding car, but too late. The car skidded into the Redding car, striking it about the left rear fender and at the same time its front end slid westerly. Plaintiff's left leg was caught between the running boards and severely crushed above the ankle. He was otherwise bruised and injured, though not seriously. He was knocked unconscious and fell to the ground beside the Redding car where he lay until picked up by a passing Good Samaritan who carried him to a sanitarium, after all others physically able to do so had left the scene.

Wilbur is charged with negligence, alleged to have been the sole cause of the accident, as follows:

Driving at a reckless rate of speed, in view of road surface conditions; failing to keep a proper lookout for traffic ahead and for others using the viaduct roadway; that he failed to bring his car under control, slow down or stop after he saw, or by the exercise of due care should have seen traffic conditions ahead of him, and plaintiff in the position he was at the time of and immediately prior to the accident.

Wilbur denies that his car injured plaintiff and, alternatively, if it did so, that he was without fault or negligence, as a proximate cause thereof. Further, in the alternative, this defendant specially pleads that plaintiff's own negligence contributed to the accident and constitutes a or the proximate cause thereof, and for this reason he should not recover. Plaintiff's action in stopping his car and returning to the scene of the first collision and standing beside the Redding car, on a slippery road surface, exposed to danger, is the basis of this plea.

The surety company, taking the position that Wilbur had breached the policy contract by not reporting to it or its agents, within the time and in the manner stipulated in the policy, the accident alleged upon by plaintiff, if such occurred, declined to defend him in this suit and suggested that he engage counsel of his own choice. He did so.

The insurer admits the issuance to Wilbur of the policy contract sued on and that when plaintiff was injured it was in full force and effect to the maximum amount of $10,000, as therein stipulated. This defendant also denies that Wilbur's car injured plaintiff.

In the alternative, the insurer specially denies liability to plaintiff under the policy for the reason that Wilbur, the assured, had breached essential covenants thereof by not notifying it of the accident, if any, charged against him, within the time and in the manner provided by and in the policy. Amplifying the allegations of this special defense, this defendant pleads:

(1) That if the accident happened as alleged, Wilbur knew or should have known of it at the time alleged to have occurred and the injury resulting therefrom;

(2) That he gave his insurer no notice of said accident until December 29, 1936; and

(3) That in the event it be established that the accident occurred as alleged and Wilbur knew nothing of the resulting injury to plaintiff, he was negligent in not ascertaining at the time and thereafter that plaintiff was injured by him.

Judgment was awarded plaintiff against both defendants, in solido, for $10,000 and against Wilbur individually for $17,414.85 additionally. Defendants have appealed.

At the time he was injured, plaintiff was ignorant of the identity of the operator of the car which struck him. He was physically incapacitated for four or five months to personally make contacts, follow up leads and direct investigations for the purpose of determining who was responsible for his injuries. When this question was determined definitely in his own mind and the name of the insurer learned, he promptly instituted this suit. Strange as it may seem, not a single witness is able to definitely say that Wilbur's car did strike the plaintiff. Not one of the Redding party knew plaintiff personally and did not know he was injured until some hours thereafter. However, the

lower court was able, without serious difficulty, to reach the conclusion that the suit was properly brought against Wilbur.

Bowman was not acquainted with plaintiff. He saw the car strike him and thought he was hurled over the left fender. He, strange to say, did not take time to check up on the results of the accident, but, evidently because of his excitement, hurried away from the scene afoot. He soon reconsidered and returned to his car, entered it and drove through the scene of the accidents, without noticing plaintiff's prostrate body not over ten feet of him, and phoned the police. He was uncertain whether the offending car stopped at the scene or not. His sole thought was to get away from the dangerous location.

In addition to Bowman, Sergeant McDowell, Poindexter, young Simmons, Redding, Wilbur and plaintiff testified as witnesses. Miss Redding was absent at college when the trial was had, but it was admitted that her evidence, if given, would be in substance the same as her father's and Simmons'.

It is here proper to record our conviction that not one of these witnesses, defendant and plaintiff not excepted, endeavored to color the testimony given by him. There are some contradictions and in some particulars the testimony on material points is irreconcilable, but we attribute these facts entirely to the most unusual conditions prevailing about the scene, the excitement at the moment and fear of injury by those present. The thought of self-preservation seems to have prompted all to hurry from the scene as quickly as possible after the second collision.

■ We have given a most diligent and studious consideration to all the testimony adduced and have arrived at the same conclusion as was reached by the trial judge. Wilbur's car struck plaintiff. We have not the remotest doubt of the correctness of this conclusion. No good purpose would be promoted by analyzing at length the testimony of each witness. We give briefly the main facts upon which our conclusion is based: It is admitted that Wilbur's car did collide with the Redding car and that the Wilbur car, as a result of the impact, described a circular movement easterly and stopped facing westerly, blocking the passage between the Begbie truck and the Redding car. Young Simmons and Mr. Redding are positive that

but one car ran into theirs in the interim between the first collision and the time they left the scene, and they left it immediately following the second collision. They had only gone a short distance when picked up by Wilbur. Redding erroneously picked up plaintiff's hat and wore it away. Therefore, it is certain that plaintiff was injured before the party left the scene. While Wilbur is positive he did not sideswipe plaintiff, yet, the truth is he does not know whether he did so or not. His car was zigzagging rapidly as he approached the scene. It was difficult for him to measurably control it; his mind was concentrated on the car's movements. Visibility was poor. He is positive he did not see Bowman and plaintiff beside the Redding car and, if he is conscientious in this statement, it is easy to understand why he believes he did not injure plaintiff.

It is argued that if Wilbur's car had struck plaintiff, Bowman could not have negotiated the passage between the truck and Redding's car immediately after plaintiff was hurt, as testified to by him, because it is certain that the Wilbur car blocked this passage-way immediately after it collided with the Redding car. Our answer to this contention is this: Bowman left the scene afoot hurriedly, as soon as plaintiff was injured, and walked an undetermined distance northerly away from his own car. He then decided to return to his car and did so. Sufficient time could have elapsed in the interim, and we think it did elapse, for Wilbur to reenter his car, if he left it, as he says, and drive on southerly to pick up the Redding party, before Bowman got back to his car.

■ We experience little trouble in reaching the conclusion that Wilbur's negligence alone made inevitable the collision of his car with that of Mr. Redding. Any driver of a motor vehicle knows when his car leaves a dry or rough surface and enters upon a surface covered with ice. Of the half dozen operators who passed the tragic scene and testified in the case, all but Wilbur knew several hundred feet away that the viaduct floor was sheathed with ice and all but him immediately exerted themselves to bring their cars under control by reduced momentum. All but him saw far ahead that an accident had occurred on the viaduct. They saw the outline of the vehicles involved therein when 200 feet or more away. He says he only at first saw the cushion seat in the

center of the space between the truck and the car and glued his eyes thereon, fearing to drive over it as he thought it was a wooden box. He denies seeing the car and truck until some 25 feet therefrom. He then applied his brakes, which was error, and practically lost control of it. Had he reduced his speed prior to this time, as conditions clearly demanded, he could have negotiated the passage-way between the injured vehicles as many others successfully did, before and after the second collision. Conditions were such as to make it imperative of operators to exercise the highest degree of care and prudence of which they were capable to the end that injury to others on the viaduct might be averted. Wilbur failed in this duty and must be held responsible for the results.

■ No negligence may be properly charged to plaintiff for acting as he did at the scene of the collision.

The insurance policy sued on contains these stipulations:

"Upon the occurrence of an accident written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident, the name and address of the insured and of any available witnesses. If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative."

"No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the conditions hereof, * * *."

The coverage clauses protect the insured against liability for damages resulting from personal injury to others and to property "caused by accident and arising out of the ownership, maintenance and use of the automobile". Personal injury liability is limited to $10,000 and property damage liability is limited to $5000, for each accident.

The extended investigation by plaintiff toward the end pointed to Wilbur as being the operator of the car that injured him. On November 30, 1936, plaintiff wrote a letter to Wilbur in which he stated that he would be pleased to discuss with him the automobile accident if he (Wilbur) had no objection. In response to the letter, Wilbur called to see plaintiff. He denied responsibility for the accident, as he has consistently done all along. Plaintiff did not accuse him nor did he even intimate that he thought him guilty. Thereafter, plaintiff did conclude that Wilbur was the tortfeasor and promptly undertook to learn the name of the company carrying public liability insurance on his car. He was extended little or no cooperation by the insurer's agents on this score. Wilbur sought to conceal no facts within his knowledge concerning the accident or the insurance. He knew he was protected by insurance, but did not know the name of the insurer. This information was, after considerable effort, finally procured by plaintiff. On December 17, 1936, he wrote Wilbur definitely apprising him of his conclusion, after considering all the evidence procured, that he was operating the car that injured him. Amicable demand for settlement was therein made. This suit was filed six days later. Service on the insurer was the first notice given it that the contention was being made that the Wilbur car had injured plaintiff.

■ The lower court found and held that Wilbur was sincere in disclaiming knowledge of injury to plaintiff. We have reached the same conclusion. No valid reason is apparent that would induce him to be untruthful about the matter; on the contrary, being protected by insurance, the conditions of which he is presumed to know, self interest would have dictated reporting the accident and injury of plaintiff to his insurer, had he believed himself the cause. He denies seeing plaintiff or Bowman beside the Redding car. But for atmospheric and other conditions prevailing about the scene at that time, this would be difficult to believe. When his car began to rapidly zigzag, his thoughts were exclusively directed toward keeping it in the center of the roadway in the hope of averting a collision with one or both of the stationary vehicles. He was taking little or no note of things on either side. Those motorists who have driven automobiles on ice-covered highways may readily appreciate Wilbur's predicament and the efforts he would naturally put forth to keep his car from skidding into

the balustrades of the viaduct or one of the other cars. True it is that he saw plaintiff's body under or beside the Redding car after his own car had stopped, but, believing he had injured no one, he naturally concluded that this was a victim of the first collision. The morning following the accidents, he reported to the police station his own part therein, so far as he was cognizant of it. The sincerity of his position is definitely reflected when it is recalled that he asked Mr. Redding at the scene if anyone had been hurt by him running into Redding's car and was given a negative reply. ·It is also true that Wilbur read in the press that plaintiff was injured by a car at the scene of the first collision. However, the newspaper accounts indicated that this was done by a "hit and run" driver whose identity was unknown. This tended to confirm in his own mind the already well formed belief that he had not injured the plaintiff. Nothing further has developed to shake his belief in his own innocence. It required many months' investigation for plaintiff himself to decide that Wilbur's car injured him.

In view of all the evidence and circumstances bearing upon the issue, we conclude that Wilbur was not negligent, nor did he violate a duty imposed by the terms of the insurance policy, by not reporting to his insurer or its agents the fact that plaintiff was injured at the same place and near the same time Wilbur's car collided with the Redding car, or for not concluding that it was a possibility that he injured plaintiff and for not advising his insurer of this conclusion.

■ It is contended, however, that as Wilbur did know that his·car collided with the Redding car, this fact should have been reported by him to the insurer and attention is called, in support of this contention, inter alia to the following printed matter on the outside of the policy:

"Important

"Notice of an accident, however slight, is required."

No such language is incorporated in the covenants of the policy. It only appears on the endorsed side thereof. The covenants are entitled to and must be given controlling effect.

■ Under the policy contract written notice of the occurrence of an accident shall be given by the insured to the insur-

er or its agent "as soon as practicable". Of course, this refers to accidents causing a loss covered by the policy. It is not every accident that must be reported to the insurer in order to preserve the policy contract from breach. Exceptions necessarily are sometimes made. Wilbur evidently reached the conclusion that his car had inflicted little or no damage to the Redding car, already badly damaged from the first collision, and had no good reason to believe any claim would be made against him on that account. So far as the record discloses, he was correct in this belief. No claim was made against him. His belief in this respect may have been strengthened from what was said by the Reddings while en route in his car. He rendered to them assistance which at the time and place was sorely needed and doubtless appreciated.

Chief Justice O'Niell, in Jones v. Shehee-Ford Wagon & Harness Company, reported in 183 La. 293, 301, 163 So. 129, 131, sums up the law governing this and kindred questions by saying:

"Under policy contracts similar to the one before us, the law does not require the insured to give notice to the insurance company of an accident unless the insured has reason to believe that the accident has caused or will cause loss covered by the policy. See Blashfield's Cyclopedia of Automobile Law, vol. 3, p. 2663, [§ 36], and the decisions cited. The condition in the policy itself, which we have quoted, requires notice to be given only 'of any accident causing loss covered hereby.' As soon as the insured, in this case, was informed that the accident had caused a loss covered by the policy, the insured gave notice to the insurer. That was a substantial if not literal compliance with the condition of the policy. The word 'immediate,' when used in such 'Conditions' in policies of insurance, does not mean 'instant.' It means within a reasonable time, or without unnecessary delay, and it admits of a reasonable excuse for some delay. Blashfield's Cyclopedia of Automobile Law vol. 3, p. 2662 [§ 36]; Huddy's Cyclopedia of Automobile Law (9th Ed.) vol. 13, 14, § 154, p. 186 et seq."

■ Pertinent to what is here said, 14 R.C.L., pp. 1330, 1331, deals with the question concisely:

"The requirement of a liability policy that notice shall be given on the occur-

rence of an accident does not require notice of an accident where no bodily injury is apparent and there is no reasonable ground for believing that a claim for damages will be made, and the duty to give notice does not arise until the subsequent facts would suggest to a reasonably prudent person that a liability might arise."

Couch's Cyclopedia of Insurance Law, Vol. 7, p. 5408, § 1538f, anent the question, states the rule thus:

"The word 'immediate' means in such convenient time as is reasonably necessary under the circumstances. Nor is it necessary to give immediate notice of an accident that is apparently trivial, if there is no reasonable ground for believing at the time that bodily injury within the meaning of the policy will result, even though the accident does not in fact have serious consequences. For instance, such a clause does not apply to every trivial occurrence, even though such an occurrence may afterwards result in serious injury."

See also 76 A.L.R., page 105; and 36 Corpus Juris, p. 1105.

The pronouncement of our Supreme Court in the Jones case, supra, is a composite of the rules laid down by the various text-writers, quoted from and referred to above.

■ With these authorities as a basis, we conclude, as did the trial judge, that Wilbur "was not required to give his insurer notice, being in good faith, ignorant of the injury and having used reasonable diligence in concluding that no claim would result from the accident."

■ Plaintiff's left leg between the knee and ankle received a comminuted fracture of a most serious character. The skin through which the bones protruded was black and blue, and the flesh was badly mashed and bruised. A malignant infection (streptococcus) quickly developed. Its progress was so rapid and alarming that it was decided to immediately amputate the injured leg at mid-thigh. This was done on Sunday morning following the accident on Friday night. It was believed that unless the operation were performed, plaintiff could not live; with it, he possibly would survive. Blood poisoning developed and the life of the patient was despaired of several times before a

turn for the better came. He was conscious to apparent imminent death. For many weeks he was conscious only intermittently. He suffered intense pain; fevers and rigors aggravated his general condition. He was a patient in the sanitarium until March 1st, a period of over sixty days, and was able to go about with the aid of crutches after the first of April. These were discarded on July 17th when he began the use of an artificial limb. The stump of the leg has healed but, as a Guillotine amputation was performed, the skin growth thereon has been slow. Intermittently it still pains and is the source of much discomfort. Weather conditions aggravate it. To some extent the discomfort will last as long as life. The other injuries caused by the collision were not serious.

Plaintiff is sixty-two years old. He is a prominent attorney of the Shreveport bar and enjoys a large practice. No contention is made that his mentality is to any extent impaired as a result of the ordeal he has gone through, but being sentenced for the remainder of his natural life to use an artificial leg is the source of inevitable inconvenience and no little embarrassment, difficult to measure in dollars and cents.

Notwithstanding that plaintiff experienced prolonged intense physical pain and suffering, accompanied by considerable mental anxiety and distress, and the loss of a limb, we are of the opinion that the award of damages to him, in view of the well established jurisprudence pertinent to cases of this character, is excessive. We think that an award of $17,414.85, made up of the following items, adequate:

Loss of leg, $10,000.00
Physical and mental pain and
    suffering, etc., 5,000.00
Expenses, 2,414.85

For the reasons herein assigned, the judgment condemning the defendants, in solido, to pay plaintiff $10,000, with interest, is affirmed; and the judgment condemning defendant Wilbur to pay plaintiff $17,414.85 additionally is amended by reducing the amount thereof to Seven Thousand Four Hundred and Fourteen & 85/100 Dollars ($7,414.85), and as amended said judgment is affirmed with costs.